# IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITES STATES OF AMERICA | ) | |
| | ) | CASE NO. 3:05-CR-234-A |
| v. | ) | |
| | ) | ORAL ARGUMENTS REQUESTED |
| TYRONE WHITE | ) | BEFORE U.S. DISTRICT COURT JUDGE |

## MOTION TO DISMISS INDICTMENT AND FOR SANCTIONS

COMES NOW the Defendant TYRONE WHITE, by and through his attorney, Julian L. McPhillips, Jr., and respectfully moves this Honorable Court to dismiss the Indictment entered against the Defendant, and for sanctions against the government for investigatorial misconduct. As grounds, the Defendant states:

1. The Auburn Police Department, while acting as an arm of the Federal government in the prosecution of this case, has engaged in heavy-handed, threatening, abusive, and illegal tactics by repeatedly threatening and coercing witnesses and promising relief from oppression if said witnesses would cooperate in their investigation of Defendant White. Specifically, Auburn police officers coerced, or attempted to coerce, testimony from at least eleven witnesses that the witnesses had given Defendant White money in exchange for Defendant White's adjusting or disposing of outstanding tickets against them.

2. The tactics employed by the Auburn Police Department in this case violate any and all bounds of propriety, and so severely violate the Constitutional rights of both the witnesses and Defendant White, that justice requires strong sanctions against the government, for its gross misconduct, up to, and including dismissal of the Indictment entered in this case.

3.   Attached hereto as **Exhibits A – K**, are affidavits of eleven witnesses, detailing how they were harassed, intimidated, threatened and coerced by the Auburn Police Department, especially by Auburn police officers **Gary Hollis**, **Jerry Holder**, and **Willie Smith**.

4.   Grand Jury witnesses **Jerry Stinson**, **Shenard Pitts**, and **Mitchell Giles** each swear, under oath, that they never gave Defendant White any money in exchange for favors, and that they were bullied, threatened and intimidated by Auburn police officers into falsely testifying before the Grand Jury. See **Exhibits A, B and C**, respectively. At least three counts of the Indictment appear to be based on the testimony of these three men, testimony only given under great coercion, intimidation and duress from the Auburn police, and from federal agents.

5.   In addition to the Grand Jury witnesses above, six individuals – **Mertis Henderson**, **Willis Edward Bass**, **Norman Pitts**, **Donald Lee Copeland**, **Adam Floyd**, and **Winfred White, Jr.** – each swear, under oath, that they never gave Defendant White any money in exchange for favors, and that Auburn police officers, assisted by federal agents, bullied, threatened and intimidated them into testifying falsely against Defendant White. See **Exhibits D, E, F, G, H and I**, respectively.

6.   **Recco Cobb** and **Patrick Threat** also recount incidents of overzealous, overbearing, threatening and intimidating actions by the Auburn Police Department in its investigation of this case. See **Exhibits J and K**, respectively. Auburn police officers, often assisted by federal agents, sought to intimidate and wrongfully induce or reward witnesses, in return for false testimony that Defendant White had accepted money in exchange for favors.

7.   The outrageous tactics employed in this case by the Auburn Police Department, with the assistance and encouragement of the Federal Bureau of Investigations, reflect very poorly on the City of Auburn and the United States of America. The egregiousness of these tactics is

beyond dispute, and severe sanctions and penalties, including dismissal of all charges against Defendant White, are due and proper.

8. A constitutional violation may assist officers in gathering evidence, but the violation has both offended the Constitution and rendered the evidence unreliable. Clanton v. Cooper, 129 F.3d 1147, 1157 (10th Cir. 1997). A coerced confession fits into this category. As stated by the Supreme Court in Jackson v. Denno, 378 U.S. 368, 385-86 (1964):

> It is now inescapably clear that the Fourteenth Amendment forbids the use of involuntary confessions not only because of the probable unreliability of confessions that are obtained in a manner deemed coercive, but also because of the 'strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will,' Blackburn v. Alabama, 361 U.S. 199, 206-207, 4 L. Ed. 2d 242, 80 S. Ct. 274, and because of the 'deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves.' Spano v. New York, 360 U.S. 315, 320-321, 3 L. Ed. 2d 1265, 79 S. Ct. 1202.

9. Consequently, because the evidence is unreliable and its use offends the Constitution, a person may challenge the government's use against him or her of a coerced confession given by another person. "Confessions wrung out of their makers may be less reliable than voluntary confessions, so that using one person's coerced confession at another's trial violates his rights under the due process clause." Id. At 1158, citing Buckley v. Fitzsimmons, 20 F.3d 789, 795 (7th Cir. 1994). Further, **"It is unthinkable that a statement obtained by torture or by other conduct belonging only in a police state should be admitted at the government's behest in order to bolster its case. . . . Yet methods offensive when used against an accused do not magically become any less so when exerted against a witness."** Id. At 1158, quoting LaFrance v. Bohlinger, 499 F.2d 29, 34 (1st Cir. 1974).

10. It is well established that the knowing use of perjured testimony by the government violates due process of law. The United States Supreme Court has indicated that perjured testimony coerced by local law enforcement authorities is so reprehensible as to establish a per se due process violation. United States v. Sanchez, 813 F. Supp. 241, 246 (D.N.Y. 1993); *citing* Pyle v. Kansas, 317 U.S. 213, 215-16 (1942); *and* Mooney v. Holohan, 294 U.S. 103 (1935).

11.  As the attached affidavits reflect, **the very integrity of the entire justice system has be seriously compromised** by the coercive, threatening and abusive tactics of the Auburn Police Department, acting as the long arm of the federal government. **The investigatorial tactics employed here are so egregious that dismissal of the government's case is the only adequate remedy**, as, indeed, the proverbial bad apples in the government's barrel have irreparably tainted them all.

WHEREFORE, above premises considered, the undersigned prays that this Honorable Court will DISMISS the Indictment entered against the Defendant; and

FURTHER ORDER sanctions against the government, of a nature and amount deemed proper, for its gross misconduct in this case.

RESPECTFULLY SUBMITTED this 15th day of November 2005,

TYRONE WHITE
Defendant

/s/ Julian L. McPhillips, Jr.
JULIAN L. McPHILLIPS, JR.
Attorney for Defendant
Alabama Bar No. MCP004
McPhillips Shinbaum, LLP
P.O. Box 64
Montgomery, AL 36101
(334) 262-1911

## CERTIFICATE OF SERVICE

I certify that, on this date, I have served a copy of the foregoing upon the Government by electronic filing, and by mailing an additional courtesy copy of same to the Government's attorneys at the addresses below:

> Todd A. Brown
> Assistant United States Attorney
> One Court Square, Room 201
> P.O. Box 197
> Montgomery, Alabama 36101

> /s/ Julian L. McPhillips, Jr.
> JULIAN L. McPHILLIPS, JR.
> Attorney for Defendant

EXHIBIT
A

STATE OF ALABAMA
COUNTY OF LEE

## AFFIDAVIT OF JERRY STINSON

1. My name is **Jerry Stinson**. I am a 33 year old black man, and I reside in Auburn, Alabama. I make this statement of my own free will. I have first hand knowledge of the facts in this statement and I am competent to testify about what happened to me.

2. I came of my own choice to make this statement about what happened to me. The Auburn police came to my job at Spencer Lumber, where I have worked for some time. The Auburn police officers told me they wanted to speak with me and started to take me outside. I thought they were taking me outside of the warehouse to talk with me in the parking lot, but when I got outside, they put me into a Dodge Durango, and drove me to Auburn police headquarters. The Auburn police told me they had a warrant for my arrest because I had not been paying my fines.

3. I had been arrested on a prior occasion where I was charged with driving recklessly on a suspended license, for resisting arrest and for having a firearm without a permit. I had gone to Auburn Municipal Court for all of these charges on April 1, 2004. The Judge gave me a suspended sentence, partly because my boss, Mr. Spencer told the Judge that I was a good worker, and that he did not think I should spend time in jail. The court ordered that I pay a fine, in installments, which I was doing. The police who picked me up said that I had not been paying the fine as ordered.

4. When the Auburn police took me to the station, they put me in a room and asked me if I knew Tyrône White. I told them I knew him from seeing him around town, because he was a police officer, but I had never had any dealing with him. The Auburn police asked me if I had given Tyrone money to fix tickets. I told them I had never even met Tyrone. However, that was not what they wanted to hear, and they told me that they had a warrant for me, and were going to put me in County Jail, if I did not start telling them the truth about Tyrone. The police had a

statement ready for me to sign before I even got there. They said that all I had to do was sign the statement, and then I could go. I did not want to go to jail and lose my job, so I signed the papers they put in front of me.

5. Two days later, I called the police department and told them that I had lied to them when they were questioning me and that I could not do that to Tyrone. I told them that I wanted to tell the truth, that I had never given Tyrone any money. They told me that if I changed my story I could get "jammed up," and sent back to jail. The Auburn police put the pressure back on me because they wanted me to stick to the statement they pressured me into signing two days earlier. I got nervous and backed off.

6. I swear that I have never had any dealings with Tyrone White. I know him from seeing him around, but I have never spoken to him. The Auburn police brought me in, and told me they were going to put me jail, because they had a warrant. The Auburn police made me sign a statement they had already prepared for me in advance, but it was not true. I decided to make this statement, today, because I want to tell the truth about what happened.

7. I swear or affirm that I have carefully read the foregoing, and that I understand its contents, and that the statements above are true and correct.

_Jerry S. Stinson_
Signature of Affiant

_JERRY Stinson_
Printed Name

STATE OF ALABAMA    )
                              ) ss.
COUNTY OF LEE         )

Subscribed and sworn to before me this 19th day of October, 2005, at Auburn, Alabama.

_____
Notary Public in and for the State of Alabama
residing at: _Montgomery, AL_
My commission expires: _11-25-09_

(SEAL)

## AFFIDAVIT OF SHENARD PITTS

My name is Shenard Pitts. I reside in Auburn, Alabama. I make this statement of my own free will. I have first hand knowledge of the facts contained herein and am fully competent to testify thereto.

I was arrested for Driving Under the Influence in December 2004. In early January, I went with a group of friends to the Sugar Bowl in New Orleans. Tyrone White was also on that trip. While we were in New Orleans, Tyrone White and I talked about my DUI. White asked who the arresting officer was. Tyrone said he worked a shift with Steven Davis and would talk with Davis about the case if he saw him.

Later in January, I appeared before Judge Bailey for my DUI. When asked by the Judge, I pleaded guilty. Judge Bailey sentenced me to six months, but suspended the sentence. Officer Steven Davis testified that I had not given him any trouble at the time of the arrest. Based on this, Judge Bailey suspended the mandatory five-day portion of the sentence. There was also a charge for carrying a firearm without a permit. Judge Bailey offered to drop that charge if I would sign my gun over to the police department for them to use it at the firing range. I agreed to the deal and signed over my gun.

At the end of July, 2005, I was driving home from the grocery store when I was flagged down by my wife. My wife asked me what I had done wrong. I did not understand what she meant and asked her to explain herself. My wife told me that a group of police officers had come to the house looking for me. I was still on probation for my DUI at the time, but as far as I knew I had met all my requirements. I had certainly not done anything that would warrant a large segment of the police force to come after me at my home.

My wife and I returned home and we drove together to Auburn police headquarters. I

asked one of the clerks why the officers had been looking for me. The clerk told me that I had

violated a court order. Typically on a violation of court order, the police mail a notice with a date

for appearance. In this case, the police used a violation of a court order as a reason to have five or

six police cars, some of them unmarked, come to my home looking for me. It was clearly an

intended to intimidate me. The clerk then told me to use the phone outside and call to the back.

Officer Brad Bass came out to speak to me.

Officer Bass walked me to a room in the back, and told me to have a seat. About twenty

minutes later, Officer Willie Smith took me into a room where a federal agent was waiting. I was

never told what the charges were against me, and I was interrogated for hours. The police officers

kept trying to get me to say I had paid Tyrone White to get rid of tickets for me.

At that time, they asked me how I knew Tyrone White. I had been a friend of his for

fourteen years. They asked if I had ever paid Tyrone to "drop" tickets. I said I had been a friend

of Tyrone's, but that I did not know anything about that. One of the officers pulled out a print out

of what I had paid toward fines. They tried to say I was trying to beat the system and they seemed

to be threatening me.

They told me they were investigating Tyrone. They showed me a document and asked if

my signature was at the bottom. I verified it was. They asked me if I could find my receipts for

the fines I had been paying. I told them I thought I could. Then they told me I could leave, but

Officer Bass met me at the door with handcuffs, saying Judge Bailey had reinstated my six month

sentence. They handcuffed me and drove me directly to County Jail. On the way, I tried to

explain that I had been complying with all the requirements of my DUI probation, going to

classes paying court costs, etc., but Officer Bass did not want to talk about it.

At County Jail, I ran across a man I know who runs a detail shop on Opelika Road, next

to the furniture store. He told me he was in for the same thing. He had been paying his fines, but had not been going to his classes, and that the officers had been trying to get him to say he had given Tyrone White money in exchange for fixing tickets. That Monday, the police came back and picked us up again. The Judge asked me if I had something to say that his office wanted to her. I told him that I did not. An FBI agent and Officer Gary Hollis took me over by the payment window in the courthouse and questioned me again about Tyrone. They said Tyrone was going down and that "Shit don't sink" so I might as well go ahead and tell them what they wanted to hear. When I still would not cooperate, they locked me back up.

In the meantime, they let the other two guys go. Later, the same day, my wife went with her friend, Shenita Carr, to appear before Judge Bailey to pay my $2,100 fine so that I could be released. My wife had the money to pay the fine, but the Judge told her he would not let me go until I cooperated.

Judge Bailey also put me on work detail picking up trash from public areas. Judge Bailey also blocked my work release. All the paperwork had been completed and the position was all lined up for me to do work release, but I received word that Judge Bailey had blocked it.

They put me back in the cell. My wife got in touch with an attorney, Gary Black, who accepted $500 and said he would talk to Judge Bailey about getting me out of jail. Judge Bailey was out of town for a convention, but three or four days later, Black told me that Judge Bailey was not going to release me unless I cooperated with his police. Black told me to tell the authorities what they wanted to hear.

I had to think about my family. People were calling my wife about the rent money. They set me up an appointment with a federal agent, Officers Jerry Holder and Willie Smith. They asked me about Tyrone. I told them I had paid him $500. That's what they wanted to hear. The

federal agents had been following Tyrone and saw Shenard in New Orleans with Tyrone there.

During the interrogation, they kept asking me how I got out of the five days. They wanted me to say Tyrone had arranged for it, but this was not true. They also kept asking me to say I had given Tyrone money to drop tickets for me.

I had not done this, so I refused. I followed him down to New Orleans and that I had been friends with him for fourteen years. They hand-wrote an affidavit as I was speaking. I signed it.

I swear or affirm that I have read the foregoing, and that I understand its contents, and that the statements above are true and correct.

_____
Signature of Affiant

Shanard Pitts
_____
Printed Name

STATE OF ALABAMA    )
                    ) ss.
COUNTY OF LEE       )

Subscribed and sworn to before me this 18th day of October, 2005, at Auburn, Alabama.

_____
Notary Public in and for the State of Alabama
residing at: Auburn, AL
My commission expires: 7/28/07

(SEAL)

EXHIBIT

C

STATE OF ALABAMA

COUNTY OF LEE

### AFFIDAVIT OF MITCHELL GILES

My name is Mitchell Giles, and I do solemnly swear that the following is true and correct in every particular.

1.  I am a 36 year old black male. I am single and of sound mind and body. My birth date is September 5, 1969. I am a brick mason.

2.  I give this statement freely and voluntarily, and without any threat, coercion, or hope of reward. In fact, it was my own idea to come to a lawyer's office in Auburn to give this statement.

3.  About a year and a half ago, my girlfriend and I got into a dispute, and I ended up being arrested by Tyrone White for domestic violence. I went to Court, and this case was resolved by my agreeing to go to class to get lessons in anger management. I was also barred from all "the projects" in Auburn for two years.

4.  Unfortunately, it was difficult for me to stay away from the projects. I have an aunt who lives there, and I couldn't help staying away from my girlfriend, who lived there. One night this past summer, 2004, I was at my girlfriend's house when Officer Humphries (the Auburn Police officer who originally barred me from the projects) caught me at my girlfriend's house. Office Humphries took me to jail, where I stayed about 12 hours until I got bonded out.

5.  Being caught in the projects after being barred from there was supposed to cost me 30 days in jail. I needed help on this matter, so I went to Charlie Core, the father-in-law of Tyrone White. Mr. Core said he didn't see the sense of going to jail for 30 days, just for seeing my girlfriend. So Mr. Core said he would "talk to someone."

6.  The next thing I heard from Mr. Core was that he (Core) thought he had this problem resolved. He said he was talking with Tyrone. At that point I was still mad at Tyrone for locking me up for domestic violence in the first place. Mr. Core told me to "swallow my pride", and let him talk to Tyrone. I agreed.

7.  Mr. Core then told me that I needed to talk with Tyrone White personally, and so I did. Officer White told me that he would have to talk with Officer Humphries, and he did.  Then, a couple of days later, I spoke with Officer White, and asked him if he had "gotten things worked out."  Mr. White said that he had gotten the problem resolved, but he told me to "stay out of the projects anymore."  He said, "Mitchell, go down to the Courthouse," and I did.  I was given a piece of paper to sign, and I did, and I was fined about $375.00. I asked a lady if that was it, and she said yes, that's it.  I asked "do I have to go to court", and she said "no."

8.  **Never at any time did I pay Tyrone White or his father-in-law, or anyone else any money or anything else for Tyrone White's helping me out, or for his father-in-law helping me.**

9.  I have my own place, where I primarily stay, but I soon learned that the Auburn police and FBI were looking for me at my mother's place, night after night.  My mother got upset and tired of it, so she gave them my cell phone number where they could contact me, and they did.

10. So I got called on my cellphone and told I had to come down to the police station to talk with them. I said "What for? I've paid all my fines.  I don't owe y'all anything."  I got threatened on the phone and told to "bring your ass down here, boy."  The police told me they might reinstate some days if I didn't come down there.  So I went.

11. It was on or about Friday evening, August 12, 2005, at the Auburn police station that I ended up being "interrogated for 4 hours" by Auburn police Jerry Holder. There was also an FBI officer in there.  **I told them the truth about not paying anything to Tyrone White, but that was not what they wanted to hear, and they threatened to lock me up for not telling them more.**

12. At that point, when I was telling the truth that they didn't want to hear, the FBI man left the room.  **I was further threatened by Officer Holder that if I didn't tell them what they wanted to hear, namely that Tyrone White was paid money by me, in return for help on my criminal trespassing charge in the projects, then he (Holder) had a call from someone to come and pick me up and take me to the Lee County Jail.** I told them "What for?" I have a hearing date scheduled for August 25, for violating the restraining order.  But Officer Holder told me "you violated the Court order, and I can lock you up right now."  I then said "What is it y'all want to hear then?"  **They made it clear that they wanted me to say I had paid Tyrone White money.**

13.     Therefore, I told Auburn police officer Holder (the FBI man was still out of the
        room) "all kinds of stuff about my paying Tyrone White money." What I told him
        was not true, but I felt pressured and coerced and didn't want to spend the
        weekend in jail. After I finished, Officer Jerry Holder said "I feel like you've told
        the truth now, and you're free to go." He also told me that if I told the grand jury
        the same thing, that would be the end of it, and I wouldn't have to come testify at
        trial.

14.     **I feel badly about being pressured and threatened by the Auburn police to
        tell a lie on Tyrone White, and I have decided to make the truth known, as I
        have stated above. I have given this statement freely, without any threats or
        suggestions or hope of reward. I came forward voluntarily and the above
        words are my words, freely spoken at a lawyer's office in Auburn, and later
        typed up but carefully reviewed by me before I signed this affidavit.**

                        Dated this 19th day of October, 2005.



                        _Mitchell Giles_
                        Mitchell Giles


    Before me, the undersigned notary public, appeared Mitchell Files, who did state that the
foregoing is true and correct in every particular.

                        _Donna B. Hickoll_
                        Notary Public
                        My Commission Expires : 11-25-07

EXHIBIT

D

STATE OF ALABAMA
COUNTY OF LEE

### AFFIDAVIT OF NORA HENDERSON

1.    My name is Nora Henderson. I am of sound mind, and make this statement of my own free will.

2.    I am a black woman, residing in Auburn, Alabama. I have lived in Auburn about fifteen years. I know Tyrone White because he is married to my cousin.

3.    The Auburn police department approached me in June to ask me some questions. They found me at my aunt's house. The Auburn police officers asked me if I had paid Tyrone White to get rid of a ticket for me. I told them that I never gave Tyrone White any money to get rid of the ticket. They asked if I had given Mr. White a room in my motel for changing the ticket. I told them that I had not given Mr. White a room in exchange for anything.

4.    I did have a ticket, which I spoke to my niece about. My niece, Charlotte Reese, then spoke to Mr. White about my ticket. I did not know the ticket had been taken care of until I went to pay the fine and was told it was already taken care of. I never gave anyone any money for this.

5.    The Auburn police told my I was lying to them, and that I should not lie. I told them I was not lying, and that I had told them exactly what had happened. The Auburn police asked me how I knew Mr. White, and if I was romantically involved with him. Mr. White is married to my cousin, so, of course, I was not romantically involved with him.

6.    The Auburn police then told me the FBI said I should not talk to Mr. White. They told me if Mr. White called, I should not talk to him. The Auburn police also told me the FBI would probably get in touch with me. I asked why, and asked the Auburn police if they just wanted me to pay the fine on the ticket. I told them I did not want to be involved with any of this

and that I would pay my fine if that is what this was about. I had not done anything wrong and I did not want to be involved with the FBI.

7.    The Auburn police said again that they hoped I was just telling the truth. I told them I was telling the truth, exactly like it happened, and that I had no reason to lie, especially to the police.

8.    The whole conversation was embarrassing, because I was at my aunt's house. The Auburn police officers said that I could take a ride with them, or they would keep talking to me there in front of my relatives. I told them to go ahead and talk to me there, because I did not want to get into their "snitch truck." The Auburn police officers told me it was not a "snitch truck" and that no one would be able to see me because the windows were tinted.

9.    I agreed they could drive me down the road and back. All I said in the truck was that I never gave Mr. White any money and that Mr. White had never given me any money.

10.    They told me not to talk to Mr. White if he tried to contact me. They did not want Mr. White to know the Auburn police had talked to me.

11.    I swear or affirm that I have carefully read the foregoing, and that I understand its contents, and that the statements above are true and correct.

_____
Nora Henderson

STATE OF ALABAMA    )
                    ) ss.
COUNTY OF LEE       )

Subscribed and sworn to before me this 24th day of October, 2005, at Auburn, Alabama.

_____
Notary Public in and for the State of Alabama

(SEAL)                              residing at: _____

My commission expires: _1_._1_3_._2007_

EXHIBIT

E

STATE OF ALABAMA
COUNTY OF LEE

## AFFIDAVIT OF WILLIS EDWARD BASS

1.    My name is **Willis Edward Bass**. I am of sound mind, and make this statement of my own free will.

2.    I am a black man, residing in Auburn, Alabama. I have lived in Auburn four years. I have known Tyrone White about two years. We met because my son is good friends with Mr. White's son.

3.    Auburn Police Officer Smith and FBI Agent Kelvin King spoke to me about Tyrone White. These men asked how I knew Mr. White. I told them our sons were good friends. Officer Smith and Agent King asked me if Mr. White had ever taken care of any tickets for me. I told them that, yes, Mr. White had taken care of a speeding ticket for me. Mr. White spoke to the officer that wrote the ticket, and the ticket was taken care of. I told this to Agent King and Officer Smith, which was exactly what happened with my ticket.

4.    Agent King and Officer Smith asked if I had to pay for the ticket to be changed. I told them "no," because Mr. White had done this as a friend. There was no money involved. They asked me again, but the answer was the same. I never paid Mr. White to fix my ticket.

5.    Then Agent King and Officer Smith went back to asking how well I knew Mr. White. I told the officers that Mr. White and I babysat for each other, because our boys were good friends. Officer Smith asked what I owe Mr. White for babysitting. I told Officer Smith that, if anyone owed the other for babysitting, then I should owe Mr. White, because he has watched my son more often than I watched his. Officer Smith wrote that down.

6.    Officer Smith and Agent King kept asking me the same questions over and over. They also asked me about another man, Mr. Pitts. They told me Mr. Pitts had told them that he

gave me some money, to give to Mr. White. I told Agent King and Officer Smith that Mr. Pitts

never gave me money to give to Mr. White. They said, "Well, that's what he said." I told Officer

Smith and Agent King to call Mr. Pitts down to the station, if he said that, so that we could all sit

down, and set the record straight. Agent King and Officer Smith did not want the two of us to be

there together, to get to the real truth of what happened, and they backed off from their questions

about Mr. Pitts.

7.     Officer Smith and Agent King talked to me a lot about the ticket I got. I told them

that a ticket is just a ticket to me. They tried to confuse me by asking the same questions over

and over, but I just answered as best I could, and told the truth.

8.     Agent King and Officer Smith told me I might get a subpoena to testify at the grand

jury. I told Agent Kind and Officer Smith that I would tell the grand jury the same thing that I

had told them.

9.     I swear or affirm that I have carefully read the foregoing, and that I understand its

contents, and that the statements above are true and correct.

_____

Willis Edward Bass

STATE OF ALABAMA     )
                     ) ss.
COUNTY OF LEE        )

Subscribed and sworn to before me this 25th day of October, 2005, at Auburn, Alabama.

_____

Notary Public in and for the State of Alabama

(SEAL)                           residing at: _____

My commission expires: _____

2

EXHIBIT

F

STATE OF ALABAMA
COUNTY OF LEE

## AFFIDAVIT OF NORMAN PITTS

1. My name is **Norman Pitts**. I am of sound mind, and make this statement of my own free will.

2. I am a black man, residing in Auburn, Alabama. I have worked for the City of Auburn for ten years, and I have known Tyrone White that entire time.

3. I was questioned at the Auburn police department headquarters by Officers Dawson and Holden. The FBI agent asked if I knew Tyrone White, and whether we hung out at each other's houses. I told them we did not. They asked a lot of questions about how Mr. White and I met. Officers Dawson and Holden also asked if I had ever given any money to Mr. White to fix tickets for me. I told them I had never given Mr. White money to fix tickets.

4. The first time I was questioned, I had just gotten off work, when my brother called me and told me to call Tommy Dawson. I asked my brother what Dawson wanted to talk to me about. My brother said he did not know. My brother and I had installed some sheetrock at Officer Dawson's house, so I called, thinking he needed some touch-up work. When I called, Officer Dawson said he needed me to come by his house after work. I told him I would, and I asked him what it was about. Officer Dawson did not want to talk about it over the telephone.

5. I went by Officer Dawson's house after work. Dawson had called my brother three or four times to say that he had not seen me yet, and that I was going to be in a lot of trouble. Dawson kept telling my brother that he was trying to keep me out of trouble. When I finally got there, Dawson asked if I knew about the stuff going on with Tyrone. I told him I did not know what was going on. Tommy Dawson told me they were investigating Tyrone.

6.     Dawson knew I had gotten a ticket, and he asked me if I had given Tyrone any money. I told him I had not given Tyrone any money. I wondered why he was asking me all these questions, when he was off duty. I also thought it was odd that Dawson was in formal clothes, even though he was at home.

7.     Dawson said Tyrone was going to be in some trouble, and that I was going to be in trouble with him. Dawson told me that I would be locked up in prison. Then he asked if I was married and whether I had kids. I told him that I had a wife and kids. Dawson asked if I had a house. I told him I did. Dawson then said it would be a shame to lose all that, to lose my job over something with Tyrone. He kept saying it was not worth it. I kept telling Dawson that I never gave Tyrone any money, and that I did not know what was going on. Tyrone took care of my ticket out of the kindness of his heart. I told Dawson that I could not say I gave Tyrone any money, because I had not given him any money.

8.     A short while after I had been talking to Dawson, a gold Nissan Maxima pulled up to Dawson's house. It was Officer Holden. Holden told me they were just trying to tie up some loose ends in this situation with Tyrone. He asked me if I knew Tyrone, and the said, "Let me ask you something, just tell the truth – that's all we're asking is for you to just tell the truth. Did you give Tyrone any money?" I told Holden that I had not given Tyrone any money, and that Tyrone had taken care of my ticket out of the kindness of his heart.

9.     Holden asked me all the same questions Dawson had asked me. He asked if I had talked to Tyrone lately, and if I had seen him. I told Holden that I see Tyrone sometimes on Wednesdays. Holden asked me whether I talked to Tyrone on the phone. I said that I did not. Holden asked me when I spoke to Tyrone last, and I said I could not remember. He asked again

if I had talked to Tyrone on the phone, and I told him that I could not remember if I had talked to him or not.

10.    Officer Holden got mad, and he cursed me out, saying, "You Goddamned liar! You talked to him last Friday at 4:00, and y'all talked for 10 minutes. Now your ass is gonna go to damn prison for that." Holden just kept cursing me. I told Holden that Tyrone might have called, but I do not screen my calls, or remember who I talked to, because I talk to a lot of people. I did not talk to Tyrone every day, so I did not think anything of it.

11.    I also told Holden that Tyrone was not the officer who wrote the ticket, so Tyrone could not have changed it by himself. Tyrone and Officer Bird spoke to Judge Bailey about my ticket, and Judge Bailey told them he would handle it however they wanted him to. I ended up having to attend an alcohol counseling class for three or four weeks.

12.    Holden told me that you can't just get rid of a DUI. Holden said that if he stops some guy with a truckload of cocaine, that's a different story – he could get rid of that. I asked Holden how he could get rid of that. Holden told me that he can get rid of cocaine, but that he can not get rid of a DUI. I still do not understand that.

13.    Tommy Dawson and Holden kept saying that I could lose my job, and that it was not worth losing my job. They kept saying I was going to lose my life and my house and my job.

14.    When the FBI agent questioned me, he asked if I had given any money to Tyrone. The agent told me they were investigating Tyrone because someone had given him money. He asked if my wife knew about Tyrone taking care of my ticket. I told him that my wife did not know anything about it, and that she was not involved. The agent asked me if I ever gave Tyrone anything for taking care of my ticket. I told him that I never gave Tyrone anything for that. He

asked if I owed Tyrone a favor for taking care of my ticket. I told him that I did not owe Tyrone anything. Tyrone did it out of the kindness of his heart, and there was nothing more to it.

15. After that, no one talked to me about Tyrone until I went before the grand jury in Montgomery. At the grand jury, I was asked whether I gave Tyrone any money. They also asked me how long I had known Tyrone, and whether we hung out. They asked if our wives were friends. I said that I do not hang out with Tyrone, and that our wives are not good friends.

16. I swear or affirm that I have carefully read the foregoing, and that I understand its contents, and that the statements above are true and correct.

_____
Norman Pitts

STATE OF ALABAMA    )
                      ) ss.
COUNTY OF LEE       )

Subscribed and sworn to before me this 24th day of October, 2005, at Auburn, Alabama.

_____
Notary Public in and for the State of Alabama

(SEAL)           residing at: _____
My commission expires: 1/13/2007

4

EXHIBIT
G

STATE OF ALABAMA
COUNTY OF LEE

## AFFIDAVIT OF DONALD LEE COPELAND

1.    My name is **Donald Lee Copeland**. I am of sound mind, and make this statement of my own free will.

2.    I am a black man, residing in Auburn, Alabama. I have lived in Auburn eight years. I have known Tyrone White as long as I have lived in Auburn. I know that Mr. White is being investigated by law enforcement because the Auburn police department talked to me about him, and the FBI made me give them a statement, in Montgomery.

3.    The FBI asked me whether I had ever given anything to Mr. White, and whether I had done any favors for him in return for favors from him. They also asked whether he had taken care of any tickets for me. I told them Mr. White had not taken care of any tickets for me, which was the truth.

4.    The FBI talked to me about how bad my record was, and it seemed like they were trying to embarrass me. They asked me if my employer ever took money out of my check to give to Mr. White. I told the FBI that my employer never took money out of my check to give to Mr. White. The FBI also asked whether I had given Mr. White anything in a lot of different ways, but I told them I had not given Mr. White anything.

5.    The FBI threatened to subpoena my wife. The FBI agents were trying to coerce me into saying something that was not true. I did not feel that was right.

6.    The FBI never talked to my wife, but the Auburn police told me they were going to put us both in jail. The Auburn police said they were going to put me in jail because they thought I was lying about Mr. White. But I was not lying. The Auburn police said that my wife and I were both going to be put on trial, and then we would be found in contempt. The Auburn police

said we were both going to be in trouble, and that we would be put in jail. My wife and I have a four year old son. The Auburn police were asking what we were going to do with out son when we both got thrown in jail. The FBI was there when the Auburn police were saying all this, but they did not say much of anything.

7.    The Auburn police told me not to tell anyone about these conversations.

8.    After I spoke to the Auburn police and FBI, the Auburn police arrested me. They told me I had a failed to appear for a hearing in a case that was pending. I had retained Auburn Attorney Lassey Davis, and I did not know anything about a hearing. The police called my lawyer, and the arrest seems to have been Ms. Davis told me to sign a waiver that I would not sue the City of Auburn for false arrest. I did not understand why I was signing a waiver when my case was not even being dismissed.

9.    The truth is that I never gave any money to Tyrone White, and Tyrone White never did me any favors. The Auburn police threatened to put me and my wife in jail, knowing that we have a four year old son to take care of. I had to do what it took to take care of my family.

7. I swear or affirm that I have carefully read the foregoing, and that I understand its contents, and that the statements above are true and correct.

_Donald J. [signature]_
Donald Lee Copeland

STATE OF ALABAMA      )
                                      ) ss.
COUNTY OF LEE          )

Subscribed and sworn to before me this 24th day of October, 2005, at Auburn, Alabama.

_[signature]_
Notary Public in and for the State of Alabama
residing at: _____
My commission expires: 1/13/2007

(SEAL)

2

EXHIBIT

H

STATE OF ALABAMA
COUNTY OF LEE

## AFFIDAVIT OF ADAM FLOYD

1.  My name is **Adam Floyd**. I am of sound mind, and make this statement of my own

free will.

2.  I am a black man, residing in Auburn, Alabama. I have lived in Auburn almost all of

my life, around twenty-eight years. I have known Tyrone White for 15 years. I run a beauty salon

and car wash in Auburn.

3.  I was approached by the FBI and a couple of Auburn police officers about Tyrone

White. I spoke with the FBI twice and with Auburn police officers on at least two different

occasions. FBI Agent King and Auburn Police Officer Smith tried three or four time to get me to

meet them at the Waffle House, but I told them I did not have any reason to meet them there.

Then they threatened to embarrass me by coming to talk to me at my place of business, if I

would not meet them at the Waffle House.

4.  I did not meet them at the Waffle House, so Agent King and Officer Smith came to

my place of business. I was not sure if my attorney should be there when the police were talking

to me, but by the time I got my lawyer on the phone, the police were already there at my shop.

About fifteen minutes after they said they were coming to my shop, five police officers were at

the front door of my business. I met them at the front  door and took them around to an office

outside of the car wash.

5.  Federal Agent King and Auburn Police Officer Smith followed me into my office.

Two uniformed police officers were posted outside of the car wash. Agent King then wrote out a

subpoena and told me I had to appear in Montgomery. Agent King also told me that I could call

him with any questions later, and that he wanted to meet with me before I went to federal court for the grand jury hearing.

6.    I did not talk to Agent King before the federal grand jury hearing, but Agent King instructed two Auburn police officers to come by my shop to tell me I did not have to come to the hearing. The police officers did not tell me why I did not have to go to the hearing, but they told my business partner that they were not worried about me coming. The officers told my partner that he was going to have to find other work, because they were going to lock me up, or get rid of me some way, and then close my business down. The Auburn officers told my partner that he was smart enough to figure out what they were going to do to me.

7.    The Auburn police started harassing me at the shop. Auburn police officers would drive by my shop all the time, slowing down and glaring at us to intimidate not only me, but my employees, and my customers. The Auburn police were obviously trying to hurt my business by intimidating my employees and my customers. I did not know why they were investigating Mr. White. It boggled my mind that they were coming by my shop all the time.

8.    I swear or affirm that I have carefully read the foregoing, and that I understand its contents, and that the statements above are true and correct.

_____
Adam Floyd

STATE OF ALABAMA    )
                     ) ss.
COUNTY OF LEE        )

Subscribed and sworn to before me this 24th day of October, 2005, at Auburn, Alabama.

_____
Notary Public in and for the State of Alabama

(SEAL)                  residing at: _____

                           My commission expires:  1/13/2007

2

STATE OF ALABAMA
COUNTY OF LEE

*W.W.*
*Winfred*

## AFFIDAVIT OF ~~WYNFORD~~ WHITE, JR.
*W.W.*   *Winfred*

1. My name is ~~Wynford~~ *Winfred* White, Jr. I am of sound mind, and make this statement of my own free will.

2. I am a black man, residing in Auburn, Alabama. I have known Tyrone White for at least 5 years. I work with Adam Floyd, a local businessman who runs a beauty salon and car wash in Auburn.

3. The Auburn police and some FBI agents came to my work in two cars. They told me to come with them to police headquarters. They were not handcuffing me, and told me that I could drive my own car. They said they just wanted to talk to me.

4. At Auburn police headquarters, Two FBI agents and Auburn Detective Holden questioned me. They asked about a ticket I received while riding my motorcycle. They asked me how I got my ticket dropped, and whether I paid Officer White to drop it. I told them that I had gone to driving school for the ticket. The Auburn police officers did not believe me, and asked if I had papers that showed I had gone to driving school.

5. The officers told me they thought I was lying to them. They asked me if I had paid Tyrone for the driving school. I told them that I stood in line, just like everyone else, and paid the clerk. They asked if I had paid a white lady or a black lady. I could not remember. I only knew that she was a clerk for the City. They asked if I saved my receipt. I did not know if I had, but offered to show them my certificate from going to driving school.

6. The Auburn police and FBI asked me a lot of questions about things I did not know anything about. For instance, they asked me a lot of things about Tyrone White. They asked me what I knew about the relationship between my boss, Adam Floyd, and Tyrone White. They

asked me whether I had overheard conversations between Mr. Floyd and Mr. White. They were very interested in knowing whether I had seen any money exchanged. I did not have the information they were looking for. At the end of the questioning, they told me I was free to go, but told me to call them if I heard or remembered anything else. They made it clear to me that they thought I was lying.

7.    I swear or affirm that I have carefully read the foregoing, and that I understand its contents, and that the statements above are true and correct.

Wynford White, Jr.
Winfred

STATE OF ALABAMA    )
                    ) ss.
COUNTY OF LEE        )

Subscribed and sworn to before me this 24th day of October, 2005, at Auburn, Alabama.

Notary Public in and for the State of Alabama
(SEAL)                    residing at: _____
                          My commission expires: 1·13·02

2

EXHIBIT

J

## AFFIDAVIT

STATE OF ALABAMA
COUNTY OF LEE

My name is **Recco Cobb**, I do solemnly swear the following is true and correct in every particular:

1.    I am of sound mind and body, and give this affidavit freely, without coercion, and on my own initiative. In fact, I came to a lawyer's office in Auburn initially on Tuesday, October 18, 2005, to give this statement to a lawyer representing Tyrone White. That lawyer did not contact me. I contacted him, and voluntarily requested that I give this statement.

2.    I understand the Auburn police department has been looking for me, to question me, in recent times. Apparently, they have a federal agent with them also, for what I have been told.

3.    Usually a six month notice is sent out if one does not pay his fines, but I found out that the Auburn police were looking for me after only two to three months of non-payment of a $30.00/month fine. So I called down to the clerk's office, at the Auburn Municipal Court, to see if there was a warrant for my arrest. The clerk said that there was, but also said she did not put the arrest warrant into the computer herself, like she does with most warrants. Instead, the lady clerk said "someone else" put the warrant into the computer.

4.    My only contact with Tyrone White was that I once had four to five tickets, and was looking at doing some time on them. I went to see Tyrone White. Mr. White told me that he might be able to arrange for me to do community service, if I would let Tyrone know if I ever saw anyone trespassing or doing anything strange then I would help him out (in other words, "snitch"). Tyrone stated that if I would agree to do all that, then he would try to help me with my tickets. So Tyrone and I went to an officer named Bass (I believe that was his name), and Mr. Bass said that "everybody deserves a second chance." So Officer Bass said "Recco, I'm going to give you this second chance, but if I catch you driving again, no judge or officer can save you."

5.    I still had to pay the fines for the tickets and sign a paper, pleading guilty, but I was saved from having to do any time, which I was originally looking at.

6.    However, I never paid any money to Tyrone White or any other Auburn police officer, including Mr. Bass. All I have paid is the fines to the court.

*Recco Cobb*
sister-in-law

7.  I will add that I know Tyrone White, because I date his ~~niece~~. I've seen Tyrone at
    family dinners, the SEC championship game in New Orleans, and I have the highest
    respect for him as a "role model" in my community.

RECCO COBB

Before me, the undersigned Notary Public, appeared RECCO COBB, who, known
to me, do swear the foregoing is true and correct in every particular on this _19th_ day of
October, 2005.

Notary Public
My Commission Expires: 11-25-07

EXHIBIT

K

### AFFIDAVIT

**STATE OF ALABAMA**
**COUNTY OF LEE**

My name is Patrick Threat, I do solemnly swear the following is true and correct in every particular:

1.  I am a black male of sound mind and body.  I am in no way related, however, to Tyrone White.

2.  This past summer, a friend of mine from Las Vegas, namely Mark Zellars, flew to Atlanta and rented a Volvo car to come over to meet me at Auburn.  We were visiting at Hooters.

3.  At that time, I was aware that the police were looking for my nephew, Recco Cobb, who looks very much like me.  The police were going everywhere to Recco's momma's house, to the house of someone named Lonnie, and to the Auburn Trails, where I have a friend.

4.  While we were at Hooters, I got out and went home and returned a couple of times, and Mark got into my car, and we went to the Auburn Trails.  When we went back to Hooters, we sat there for an hour and half.  As we were getting into the car, I noticed several Auburn police officers standing in front of the diner, carrying on a conversation.  They were acting sort of inconspicuous, as if they were not looking at us, but it seemed that maybe they were.  Nonetheless, Mark Zellars and I got back into the car, and went back to Auburn Trails.

5.  When we returned to Auburn Trails, Mark and I, and another person named Frankie Tyner, went upstairs.  Lonnie was at home this time.  We stayed approximately 10 to 15 minutes.  Lonnie was with us then.  As we left Auburn Trails, in our car, we turned right, and suddenly about five or six Auburn police cars, with one detective car, came from everywhere, and pulled up beside us, pointing guns at us, and _when they got out,_ telling us to pull over.  We went about 25 feet _(both of us)_ before stopping, and I noticed that another Auburn policeman was at the top of the hill, blocking the intersection of the street.  When we pulled over, it was just about to turn dark, and all the lights were on the police cars were shining, and the police jumped out, brandishing their guns.  Some of the police were in uniforms, and some were in plainclothes.  _F.T_

6.  Mark Zellars and I couldn't figure out why in the world we had been stopped, or what in the world we had done.  We knew that we had done nothing wrong.  One of the Auburn police officers named Bass came up to me, and pointed to Mark, and asked who he was.  Then Mr. Bass said "what do you have in your mouth? (Speaking to me)" Officer Bass repeated the questions several times, and I kept telling him I had nothing.  The truth is I didn't have anything in my mouth, and  I told him the officer repeatedly, in answer to his repeated questions.

*Detective Murry P.1*

7.  Then another officer stepped forward, and grabbed my arm from behind and twisted it painfully behind my back, forcing me to the ground. I wasn't resisting anybody. In fact, other Auburn police officers standing nearby did not come to assist the Auburn officer, because it was obvious I was not resisting. I believe all this is on camera, and should reflect that I was not resisting. Nonetheless, the Auburn police officer kept acting like something was in my mouth, and then said "he done cut his hair," suggesting he thought I was my nephew, Recco Cobb, who looks much like me, except that he has dredlocks.

8.  Then the Auburn policeman claimed that they found marijuana in the console of Mark Zellars car, but they never showed it to either of us. They charged Mark Zellars with "possession of marijuana" and me with "resisting arrest and disorderly conduct." They took us both to the Lee County jail.

9.  Before we went into the Lee County jail, Officer Bass got on his radio and said to someone, "give me an NCIC report on Patrick Threat." However, the report came back negative, as I have no record. The police took me into booking anyway, and detective Murray took a statement. While doing it my phone rang. Detective Murray picked it up and didn't answer it, and started going through all my numbers, before cutting my phone off.

10. Nothing was ever said to me about Tyrone White. However, it occurred to me that all this investigation was related to what was going on with my nephew, Recco.

11. I know at the time that the Auburn police were looking hard for Recco, and since I look like Recco (except I do not have his dreds), what happened to me was obviously a case of "mistaken identity." Unfortunately, the Auburn police roughed me up and charged me with something I didn't do.

12. There were about ten Auburn police involved in this incident. About seven or eight of them were white, and there were probably two blacks. There was also someone in a private suit. I don't know where he was from, but I got the impression that he was a "fed."

_Patrick Threat_
PATRICK THREAT

Before me, the undersigned Notary Public, appeared PATRICK THREAT, who, known to me, do swear the foregoing is true and correct in every particular on this 10th day of October, 2005.

_Donna Pickett_
Notary Public
My Commission Expires: 11-25-07